UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| DAVID ELLIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:09-CV-131 |
| v. | ) | |
| | ) | Chief Judge Curtis L. Collier |
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Now before the Court are competing motions for summary judgment:  one filed by Defendant State of Tennessee ("Defendant") (Court File No. 32) and one filed by Plaintiff David Ellis ("Plaintiff") (Court File No. 47).  Both motions have been fully briefed and are ripe for decision (Court File Nos. 33, 34, 47, 48, 51, 52).  For the following reasons, the Court will **GRANT** Defendant's motion for summary judgment (Court File No. 32) and will **DENY** Plaintiff's counter motion for summary judgment (Court File No. 47).

## I.     BACKGROUND

### A.     Procedural History

This is an employment discrimination action.  Plaintiff claims his former employer, the Bradley County Election Commission ("Election Commission") discriminated against him on the basis of his disability.  Plaintiff states these claims under the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*

These claims have been before the Court previously.  In December 2006 Plaintiff filed an

earlier lawsuit. *See Ellis v. Bradley County*, No. 1:06-CV-260, 2007 WL 1830756 (E.D. Tenn. June 22, 2007). In this first case, Plaintiff alleged his employer was Bradley County, Tennessee. *Id.* Bradley County successfully filed a motion to dismiss, however, arguing the State of Tennessee, rather than it, was actually Plaintiff's employer. *See id.* On that basis the Court dismissed Plaintiff's case, Plaintiff appealed, and the United States Court of Appeals for the Sixth Circuit affirmed in an unpublished order. *Ellis v. Bradley County*, No. 07-5939 (6th Cir. June 6, 2008).

Plaintiff then filed the present action against the State of Tennessee. Plaintiff's complaint alleges Defendant unlawfully refused him a reasonable accommodation and ultimately terminated his employment because of his disability, in violation of the Rehabilitation Act and the FMLA (Court File No. 1). Defendant filed a motion for summary judgment (Court File No. 32), and Plaintiff responded with his own counter motion for summary judgment (Court File No. 47).

**B. Relevant Facts**

In 1984, the Election Commission appointed Plaintiff as the Administrator of Elections for Bradley County ("Administrator"). Plaintiff served in this capacity for over twenty-two years, until his termination on October 6, 2006. In 1994, Plaintiff was diagnosed with Chron's disease and has struggled with this condition ever since. The parties agree this constitutes a disability, as the symptoms are extremely uncomfortable and interfere with nearly every basic life activity. Despite these symptoms, Plaintiff was able to perform the essential functions of his position for over a decade.

In 2003, Plaintiff started a business called the eGovernment Institute. He started this business as a way to facilitate purchases made by the Election Commission, since he was in charge of requisitions as part of his job duties. Members of the Election Commission were fully aware of

this business venture, and actively encouraged him in the undertaking, on the condition he not make a profit on any merchandise sold to Bradley County. Plaintiff states he never made a profit through this venture.

Plaintiff's disability caused him to work irregular hours. Though his office generally opened around 8:30 or 9:00 a.m., Plaintiff would frequently not arrive to the office until around noon. Though Defendant contends Plaintiff worked "when he felt like he needed to be at work" (Court File No. 33 at 7), Plaintiff asserts he worked whenever his physical condition allowed. Plaintiff made up for his absences by working from home, outside the office, or on evenings, to complete all the tasks associated with his position.

Because he was rarely in the office, however, the Election Commission received complaints from members of the public about his unavailability (Court File No. 49, Ex. 1 at 27–32, 35–37, 41–42). Following one such complaint, in July 2005, at an Election Commission meeting, Plaintiff was urged to be more physically present at the office (*id.*). In August 2005, after this and similar requests were ignored, the Election Commission requested in writing Plaintiff maintain a record of the hours he actually worked (*id.* at 135–44). Plaintiff disregarded these requests, however, as he felt being "in management" meant "punching the clock" was not part of his job (Court File No. 49, Ex. 9 at 203–04). Plaintiff notes these events occurred at a time when Plaintiff's medical condition was at its worst.

The Election Commission's frustration with Plaintiff came to a head on April 21, 2006. On this date, early voting was proceeding in Bradley County. At some time that morning, the early voting computers crashed. Plaintiff was in charge of this election process (Court File No. 49, Ex. 8 at 156-57). While the computers were down, members of the Election Commission were unable

to reach Plaintiff by telephone. This was apparently because Plaintiff was at home asleep. At his deposition, Plaintiff testified he "started moving around about 1 o'clock that morning." (*id.*). No one at the office knew Plaintiff was taking a day off from work, however. Plaintiff admits he never contacted anyone in the office to let them know his health prevented him from coming into work on April 21, 2006 (*id.* at 151). Plaintiff's unavailability during this crisis caused frustration among several members of the Election Commission.

When the Election Commission eventually reached Plaintiff by telephone later on April 21, 2006, Plaintiff requested a short medical leave because his condition had grown worse. The Election Commission agreed to relieve Plaintiff of his duties until he formally presented a letter from his physician requesting the medical leave (Court File No. 49, Ex. 1 at 86). On April 24, 2006, the Election Commission held a meeting to discuss Plaintiff's medical condition. Plaintiff presented a letter from his physician requesting a three-week medical leave of absence (*id.* at 89, 93–96). The Election Commission approved the request but directed the medical leave be indefinite until Plaintiff could provide a letter from his physician releasing him to return to work (*id.*). Thereafter, on May 12 and May 25, 2006, Plaintiff supplemented the Election Commission with additional letters from his physician, indicating more medical leave was required.

On June 12, 2006, Plaintiff informed the Election Commission his physician had released him to return to work. Election Commission members decided, however, to hold a formal meeting with Plaintiff before reinstating him to his position, because members had ongoing concerns about Plaintiff's past job performance (Court File No. 49, Ex. 1 at 106–08). The Election Commission did not schedule this meeting until August 4, 2006. This delay severely frustrated Plaintiff, who was anxious to return to work. Plaintiff continued to receive his salary during this delay, however (*id.*).

On July 26, 2006, while the Election Commission had still not held a meeting concerning Plaintiff's reinstatement, Plaintiff filed a charge of unlawful discrimination with the Tennessee Human Rights Commission and the Equal Employment Opportunity Commission, alleging the Election Commission's failure to reinstate him constituted disability discrimination.

At some point between June 12, 2006, and August 4, 2006, the Election Commission became aware that an employee of the county mayor's office was investigating transactions conducted by Plaintiff through his eGovernment Institute business. This investigation was commenced at the behest of Fran Green, who replaced Plaintiff as acting administrator of elections while Plaintiff was on medical leave (Court File No. 49, Ex. 6 at 10). The mayor's investigation concluded Plaintiff's purchases from an entity he controlled violated Tennessee law (*id.*). *See* Tenn. Code Ann. § 12-4-101 (prohibiting a public official from entering a political subdivision into a contract in which he possesses a conflict of interest).

On August 4, 2006, the Election Commission held a special meeting to consider Plaintiff's reinstatement. At this meeting, Plaintiff presented a formal letter requesting his position be reinstated and that reasonable accommodations for his disability be made. At this same meeting, the Election Commission met with Barrett Painter, the county attorney assigned to review Plaintiff's allegation of unlawful discrimination. Mr. Painter recommended Plaintiff be formally reinstated to prevent a violation of Plaintiff's rights under the FMLA. Mr. Painter also recommended, however, that Plaintiff be suspended with pay until the mayor's investigation into his eGovernment Institute transactions was completed. The Election Commission adopted this recommendation, reinstated Plaintiff, and suspended him with pay (Court File No. 49, Ex. 1 at 116–18).

At the conclusion of the investigation, on October 6, 2006, the Election Commission held

a final meeting on Plaintiff's employment. The Election Commission voted unanimously to terminate Plaintiff's employment, both in light of his past job performance and the revelations which came to light in the mayor's investigation.

## II.    STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). First, the moving party must demonstrate no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based solely on its allegations, but must submit significant probative evidence to support its claims. *Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

The moving party is entitled to summary judgment if the non-movant fails to make a sufficient showing on an essential element for which it bears the burden of proof. *Celotex*, 477 U.S. at 323. In short, if the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court may enter summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III.    DISCUSSION

As previously stated, this case is brought pursuant to the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.* Plaintiff asserts three claims of disability discrimination.   First, he alleges Defendant violated the Rehabilitation Act by terminating him because of his disability (Court File No. 1 at ¶ 14).   Second, Plaintiff alleges his termination was in retaliation for his insistence upon a reasonable accommodation of his disability, his charge of disability discrimination, and his use of protected medical leave, in violation of both the Rehabilitation Act and the FMLA (*id.* at ¶ 18).   Third, Plaintiff alleges Defendant violated the Rehabilitation Act by failing to accommodate Plaintiff's disability during his employment (*id.* at ¶ 15–18).   The Court concludes Defendant is entitled to summary judgment on all three claims.

### A.   Employment Termination

The Rehabilitation Act prohibits qualified employers from discriminating against an employee "solely by reason of her or his disability."   29 U.S.C. § 794(a).   Claims of employment discrimination under the Rehabilitation Act are subject to the same analysis as employment discrimination claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq. Doe v. Salvation Army in U.S.*, 531 F.3d 355, 357 (6th Cir. 2008).   Under either statute, an employee alleging disability discrimination must prove he suffered an adverse employment action solely because of his disability.   *Jones v. Potter*, 488 F.3d 397, 409 (6th Cir. 2007).   Where, as here, the employee has only circumstantial evidence of such discrimination and the employer has moved for summary judgment, the Court applies the familiar three-step burden-shifting framework originally articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).   *Id.* at 403-04.

Under *McDonnell Douglas*, the initial burden rests with the employee to establish a *prima facie* case of disability discrimination. If the employee succeeds, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment decision. If the employer carries this burden of production, the burden returns to the plaintiff to show the employer's proffered reason was merely a pretext masking illegal discrimination. *Id.* at 404.

### 1. *Plaintiff's* Prima Facie *Case*

The *prima facie* case of disability discrimination requires an employee show five elements: 1) that he is disabled, 2) that he is otherwise qualified for the job, 3) that he suffered an adverse employment action, 4) that his employer knew or had reason to know of his disability, and 5) that, following the adverse employment action, either he was replaced by a nondisabled person or his position remained open. *Id.* (citing *Timm v. Wright State Univ.*, 375 F.3d 418, 423 (6th Cir. 2004); *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1185(6th Cir. 1996)).

Defendant focuses only on the second element in arguing Plaintiff fails to meet his *prima facie* burden, arguing Plaintiff was not qualified to be an administrator of elections under state law. Generally, an employee establishes he is qualified for a position if he can present "credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575–76 (6th Cir. 2003). Plaintiff's twenty-two years of service strongly suggest the county election commission itself concluded at least initially Plaintiff possessed all of these criteria. Defendant argues, however, Plaintiff lost his qualifications for employment as administrator of elections when his appointment to that position was subsequently prohibited under state law.

Under Tennessee law,

> it is unlawful for any officer, committee member, director, or other person whose duty it is to vote for, let out, overlook, or in any manner to superintend any work or any contract in which any municipal corporation, county, state . . . or other political subdivision created by statute shall or may be interested, to be directly interested in any such contract.

Tenn. Code Ann. § 12-4-101(a)(1). "'Directly interested' means any contract with the official personally or with any business in which the official is the sole proprietor, a partner, or the person having the controlling interest." *Id.* If an official violates this section, "[s]uch officer shall be dismissed from such office the officer then occupies, and be ineligible for the same or a similar position for ten (10) years." *Id.* at § 12-4-102 (hereinafter, "ouster law").

Defendant argues Plaintiff violated Tenn. Code Ann. § 12-4-101 and was thereby rendered ineligible to be an administrator of elections for ten years. Indeed, it appears Plaintiff admits to a course of conduct which on its face violates the statute. Plaintiff admits using his authority to purchase merchandise for the election commission from a company he himself owned and operated (Court File No. 48 at ¶¶ 51–53, 55). Plaintiff counters this conduct does not violate the statute, because he did not make a profit on the transactions. The Supreme Court of Tennessee has held, however, a self-dealing transaction violates the statute, "no matter how honest it may be." *Madison County v. Alexander*, 94 S.W. 604, 604–05 (Tenn. 1906) (holding statute violated when member of county court sold peas to county workhouse, even though the price charged for the peas was reasonable).

The Court cannot conclude, however, Plaintiff's conduct rendered him ineligible for the position. Under state law an official may violate the statute yet not be subject to dismissal. *See State ex rel. Wallen v. Miller*, 304 S.W.2d 654, 659 (Tenn. 1957). The Tennessee Supreme Court has held "'a distinction must be drawn between the acts done in good faith but unenforceable

9

because the statute makes them so, and acts of willful misconduct, as where a public officer corruptly and fraudulently abuses his powers in making the contract.'" *Id.* (quoting *State ex rel. Citizens of Lawrenceburg v. Perkinson*, 19 S.W.2d 254, 255 (Tenn. 1929)). Contracts in violation of the statute but made in good faith are merely unenforceable. *Id.* The official is only subject to dismissal if the violation constitutes willful misconduct. *Id.* In this case, Plaintiff argues the transactions were conducted in good faith, and he is entitled to this inference on summary judgment. Accordingly, the Court cannot conclude Plaintiff was barred from his position by Tenn. Code Ann. § 12-4-101.

Because Defendant does not dispute any other element of Plaintiff's *prima facie* case, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination.

### 2. *Defendant's Reason*

According to Defendant, Plaintiff was terminated because of poor work performance and because he violated Tennessee law by causing the election commission to purchase merchandise from his own company. Though all five commissioners of the Bradley County Election Commission voted unanimously to terminate Plaintiff, each member has articulated an independent reason motivating his or her decision. Three of the commissioners voted to terminate Plaintiff in light of his poor work performance.[1] One commissioner voted to terminate Plaintiff because of the activities

---

[1] Commissioner Armstrong: "We had our issue, his failure to come to work. And I am one of the ones that told David time and time again, 'I don't understand why you think it's okay to not come to work.' And we're not talking about being sick. We're talking about day in and day out not coming to work in a timely fashion when he did, like maybe the middle of the day or maybe even later in the afternoon." (Court File No. 49, Ex. 2 at 37). Commissioner Burgner: "I cast my vote to terminate the employment of David Ellis based primarily on Mr. Ellis's poor work performance. Mr. Ellis was habitually absent from his office during business hours. When absent, he often could

surrounding the contracts made with his own business.[2]  The fifth commissioner voted to terminate Plaintiff in light of both his work performance and his alleged self-dealing.[3]

Plaintiff argues Defendant has failed to articulate a legitimate, nondiscriminatory reason for the Election Commission's failure to promptly reinstate him following his return from medical leave in June 2006.  The undisputed record indicates Plaintiff informed the Election Commission he was able to return from medical leave "without restrictions" on June 12, 2006, but he was not immediately reinstated (Court File No. 49, Ex. 1 at 106–08).  At his deposition, Commissioner Elliston testified the Election Commission did not immediately reinstate Plaintiff because they had ongoing concerns about his work performance and felt it was necessary to hold a formal meeting with Plaintiff prior to his reinstatement (*id.* at 106–08).  *See* Tenn. Code Ann. § 8-44-102 (requiring commissions to make decisions at public meetings).  That meeting did not occur until August, however, because the commissioners and Plaintiff had difficulty scheduling a mutually convenient meeting time (*id.* at 108).  According to Commissioner Elliston, scheduling the meeting was low

not be reached by phone and his office staff was unaware of his whereabouts."  (Court File No. 45, Ex. 10 at ¶ 3).  Commissioner Hamilton: "I cast my vote to terminate the employment of David Ellis based primarily upon Mr. Ellis's refusal to come to work when able.  The proverbial straw that broke the camel's back was Mr. Ellis's unannounced absence from work and unavailability by phone on April 21, 2006.  I was prepared to terminate Mr. Ellis's employment at that time."  (Court File No. 45, Ex. 12 at ¶ 3).

[2]Commissioner Kelley: "I cast my vote to terminate the employment of David Ellis based upon Mayor Davis's October 2, 2006 letter and the rationale contained therein."  The letter referenced by Commissioner Kelley in his affidavit concluded Plaintiff violated Tennessee law by "contracting with the Bradley County Election Commission through eGovernment Institute for the sale of the palm computers and the software developed by eGovernment Institute."  (Court File No. 45, Ex. 3 at 5).  The letter went on to recommend the Election Commission terminate Plaintiff's employment and demand reimbursement for the eGovernment Institute invoices (*id.*).

[3]Commissioner White made a written motion to terminate Plaintiff "[a]s a result of our investigation, the findings of the County Mayor's office, and reviewing such things as the directives regarding office hours which were not adhered to."  (Court File No. 44, Ex. 1 at 35).

priority because Plaintiff continued to receive his salary during the interim (*id.*).

Plaintiff argues he suffered an adverse employment action during the two-month delay between when he was ready and able to return to work and when the Election Commission held a meeting on the matter. Unfortunately, the law does not support this position. "An adverse employment action 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Lentz v. City ov Cleveland*, 333 F. App'x 42, 57 (6th Cir. 2009). The Sixth Circuit has held no adverse employment action results when an employee is suspended with pay. *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) (holding being placed on paid administrative leave did not constitute adverse employment action); *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (holding employee did not suffer adverse employment action when suspended with pay pending investigation into her involvement in wrongdoing); *Jackson v. City of Columbus*, 194 F.3d 737, 752 (6th Cir. 1999) (holding police chief's suspension with pay was not an adverse employment action). Thus, even if the two-month delay between June and August 2006 constitutes a *de facto* suspension in this case, it does not rise to the level of an adverse employment action, because this suspension was with pay and there is no indication the Election Commission intended to affect a permanent change in Plaintiff's employment status.

Moreover, once the Election Commission finally held its meeting in August 2006, it voted to formally reinstate Plaintiff and suspend him with pay, pending an investigation into Plaintiff's past self-dealing (Court File No. 49, Ex. 1 at 106–08). According to Commissioner Elliston, at some point between June 2006 and August 2006, the Election Commission became aware of the potential

impropriety of Plaintiff's self-dealing transactions (Court File No. 49, Ex. 1 at 116–21, 139). In light of this revelation, at the August 2006 meeting, the Election Commission suspended Plaintiff with pay pending the results of an investigation into the transactions (*id.* at 116–18). Thus, it does not appear Plaintiff suffered an adverse employment action until his actual termination in October 2006. *See Michael*, 496 F.3d at 594.

Even if Plaintiff's suspension constitutes an adverse employment action, however, Defendant has articulated a legitimate, nondiscriminatory reason for it–that is, the need to wait for the results of the mayor's investigation. Therefore, because Defendant has articulated legitimate, nondiscriminatory reasons for both Plaintiff's suspension and his termination, the burden shifts back to Plaintiff.

### 3. Pretext

The remaining question is whether Defendant's articulated reasons are pretexts designed to mask discrimination. *See Jones*, 488 F.3d at 406. To survive summary judgment, Plaintiff must demonstrate evidence exists indicating Defendant's reasons 1) had no basis in fact, 2) did not actually motivate his suspension and ultimate termination, or 3) were insufficient to warrant his suspension and ultimate termination. *Id.* (citing *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). Plaintiff "must do more than simply impugn the legitimacy of the asserted justification . . . ." *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 730 (6th Cir. 1999). Rather, Plaintiff "must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Id.*

In this case, the question of pretext is complicated by the fact that the employment decisions were made by the Election Commission, which represents the culmination of five individual

commissioners' private motives. In addition, the composition of the Election Commission changed over time. On June 12, 2006, when Plaintiff announced his intent to return to work, and on August 4, 2006, when the Election Commission suspended Plaintiff, Commissioner Elliston was serving on the Election Commission (Court File No. 49, Ex. 1 at 25–27). On August 14, 2006, however, Commission Elliston resigned and was replaced by Commissioner Burgner (*id.*), who was serving when Plaintiff was ultimately terminated on October 6, 2006. Thus, determining the Election Commission's motivation in this case is something of a moving target.

One consequence of this ambiguity is that the statements of individual commissioners, regarding their justification for terminating Plaintiff, are not entirely consistent. Plaintiff seizes upon this inconsistency to argue the commissioners' justifications are mere pretexts. For example, Plaintiff notes "Commissioner Armstrong's asserted reason for discharging Ellis differs significantly from the reason put together by Defendant after Ellis filed his charge of discrimination" (Court File No. 47 at 18). As Plaintiff notes (*id.*), at her deposition Commissioner Armstrong repeatedly testified the Election Commission discharged Plaintiff "[f]or not coming to work, his failure to show up at work," and that this was "the sole and exclusive reason," and that there was "no other reason that [she was] aware of [or] that [she] recall[ed]." (Court File No. 47, Ex. 2 at 33, 39, 45). From this, Plaintiff argues Commissioner Armstrong's statements contradict Defendant's assertion that one of the reasons for Plaintiff's discharge was the results of the investigation into his self-dealing transactions (Court File No. 47 at 18). Plaintiff argues this contradiction erodes the credibility of Defendant's evidence and is sufficient to convince a jury Defendant's reasons are merely pretext.

Plaintiff's hypertechnical argument, however, ignores the realities of group decision-making, in which each member may have vastly different motivations and yet reach an identical conclusion.

*See Lamphere v. Brown Univ.*, 875 F.2d 916, 922 (1st Cir. 1989) ("[C]hanging reasons, failure to articulate reasons contemporaneously, conflicts among individuals' reasons, etc. might . . . simply reflect a group decision-making process at work in the highly subjective area of faculty hiring."). It is perhaps for this reason the Sixth Circuit has indicated the liability of a board is based upon the evidence its respective members, when considered individually, possessed discriminatory intent when voting for or against an employment action. *See Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250 (6th Cir. 2006).

When a particular employment decision requires the votes of multiple individuals, the Sixth Circuit has held courts must apply a "but for" test to determine "whether improperly motivated members supply the deciding margin." *Id.* at 262. In *Scarbrough*, the Sixth Circuit adopted the approaches of the Second, Third, and Ninth Circuits, which "have implied that a board is liable for actions that it would not have taken 'but for' members acting with improper motive. *Id.*; *see also LaVerdure v. County of Montgomery*, 324 F.3d 123, 125 (3d Cir. 2003) (holding no municipal liability because board voted unanimously and only one member had improper motive); *Jeffries v. Harleston*, 52 F.3d 9, 14 (2d Cir. 1995) ("[T]he nine votes based on legitimate grounds constitute a superseding cause breaking the causal chain between the tainted motives . . . and the decision."); *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1239 (9th Cir. 1994) (holding no municipal liability because board acted unanimously and only one member had improper motive).

In *Scarborough*, the plaintiff applied for the position of school director. 470 F.3d at 253–54. After interviewing the plaintiff, the school board selected another candidate. *Id.* The plaintiff alleged the board voted against him because of a newspaper article reporting he had agreed to speak at a church convention with a predominantly gay and lesbian congregation. *Id.* He sued the board

and each of the individual members under 42 U.S.C. § 1983, alleging violations of his First Amendment rights to freedom of speech and freedom of association. *Id.* On appeal, the Sixth Circuit considered the potential liability of the board itself, as distinguished from that of the individual board members. The court concluded the school board was "liable for actions that it would not have taken 'but for' members acting with improper motive. Thus, where improperly motivated members supply the deciding margin, the board itself is liable." *Id.* at 262. Concluding the plaintiff had submitted evidence indicating three of the four members of the school board voted with improper motivation, the Sixth Circuit held summary judgment in favor of the board was improper. *Id.* at 263.

This reasoning in *Scarborough* has been extended beyond § 1983 and applied to claims of employment discrimination. *See Kendall v. Urban League of Flint*, 612 F. Supp. 871 (E.D. Mich. 2009). In *Kendall*, the biracial employee of a local civil rights organization alleged he was not hired as its chief executive officer because the chairperson of its board did not believe he was "black enough." *Id.* at 872. The employee filed a claim of employment discrimination under 42 U.S.C. § 1981. *Id.* at 876. In light of *Scarbrough*, the district court concluded the employee must do more than merely show the chairperson herself was motivated by discriminatory intent. *Id.* at 881. He must show the chairperson influenced the votes of the other thirteen members of the board. The district court concluded the employee failed to meet this burden:

> [P]laintiff has produced no evidence suggesting that [the chairperson] had any such influence on the other board members. Every board member has been deposed, and all have testified that they cast their votes independently based on their own consideration of the candidates' qualifications. In the end, the evidence shows only that [the chairperson] may have had a discriminatory motive, but not that the decision-maker (i.e., the board of directors) had any such motive.

*Id.* at 881.

Applying *Scarbrough* to this case, the relevant inquiry whether Defendant's reasons are pretexts must focus on the individual motivations of all six of the commissioners involved. In other words, for Plaintiff's suspension on August 4, 2006, the relevant motivations are those of the five then-serving commissioners, including Commissioner Elliston, whereas Commissioner Burgner's motivation replaces that of Commissioner Elliston in consideration of Plaintiff's ultimate termination on October 6, 2006.

Viewing the record through this lens, the Court concludes Plaintiff has not identified any evidence suggesting any of the commissioners–much less a majority–were influenced by a discriminatory intent. Indeed, Plaintiff has not identified any evidence in the record from which a reasonable juror would be led to reject Defendant's explanation for his termination. All of Plaintiff's arguments appear to fall under the second category of pretext challenges–that Defendant's reasons did not actually motivate the adverse employment actions. *See Jones*, 488 F.3d at 406.

### a. Inconsistencies

First, as referenced above, Plaintiff argues the inconsistency between the commissioners' respective statements indicates their reasons for his termination are pretexts. This argument is unpersuasive in light of *Scarbrough*'s directive that each board member's vote be considered individually. *See* 470 F.3d at 262. Commissioner Armstrong's testimony that the "sole and exclusive reason" for Plaintiff's termination was his job performance is not inconsistent with statements made by other commissioners. Rather, Commissioner Armstrong's testimony is entirely consistent with Defendant's argument that the Election Commission's individual members had two bases for its decisions. As implied in *Scarbrough*, Defendant is not required to articulate a single rationale for each member of a group. *See id.* And Plaintiff has not identified any statements made

by Commissioner Armstrong indicating she had some other reason for voting to terminate him. Therefore, neither Defendant nor Commissioner Armstrong's credibility is undermined because the motivations of other commissioners differed.

### b. Shifting Justifications

Second, similar to his first argument, Plaintiff argues Defendant's multiple reasons constitute a "shifting justification" for his treatment, which courts have held may indicate a pretext. *See Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) ("Shifting justifications over time calls the credibility of those justifications into question. By showing that the defendants' justification for firing him changed over time, [the plaintiff] shows a genuine issue of fact that the defendants' proffered reason was not only false, but that the falsity was a pretext for discrimination."). In this case, there is no such shifting justification. Tellingly, Plaintiff cites no specific examples of a shifting justification. Indeed, Plaintiff has not identified anywhere in the record where an individual commissioner changed his or her stated justification behind his or her vote. Rather, the record only indicates two consistently represented justifications, representing the varying views of the six Election Commission's members involved in this case.

### c. Plaintiff's Past Performance

Third, Plaintiff argues the Election Commission was satisfied with his job performance prior to his medical leave, which he argues contradicts the subsequent criticism of his performance. Plaintiff argues the Election Commission must have been satisfied with his job performance, because it "fully intended to return him to work once his physician released him" (Court File No. 47 at 17). For this proposition, Plaintiff relies upon the deposition of Commissioner Elliston, who testified it was his intent as chair of the Election Commission to reinstate Plaintiff at the end of his medical

leave (Court File No. 49, Ex. 1 at 92). However, when directly asked whether he was personally satisfied with Plaintiff's job performance, Commissioner Elliston answered, "With certain exceptions, yes." (*Id.* at 27). When asked to elaborate on those exceptions, Commissioner Elliston responded, "There was always an ongoing controversy about Mr. Ellis' presence in the office, and it centered around complaints that we would receive from time to time that Mr. Ellis was not available in the office. Members of the public expected him to be there." (*Id.*). Indeed, a review of the record indicates all of the commissioners repeated this frustration with Plaintiff's performance.

Moreover, even if the Election Commission's intent to reinstate Plaintiff in April 2006 creates an inference that his job performance was satisfactory, this event is too remote in time to indicate a majority of the board voted with discriminatory intent in October 2006. By then, Commissioner Burgner had replaced Commissioner Elliston on the board. Thus, any satisfaction with Plaintiff the Election Commission had in April 2006 cannot be imputed to Commissioner Burgner, because his personal assessment of Plaintiff's record was formed after his appointment in August 2006. Because Plaintiff offers no evidence detracting from Commissioner Burgner's credibility, his dissatisfaction with Plaintiff's performance is free of any suspicion of pretext.

In addition to this vote, as discussed above, Commissioners Kelley and White indicated they voted to terminate Plaintiff because of his self-dealing transactions.[4] These three votes constitute

---

[4]While Commissioner Kelley relied solely on Plaintiff's self-dealing, Commissioner White indicated his vote was based on both Plaintiff's self-dealing and his job performance. *See supra.* Even if the events of April 2006 indicate Commissioner White's criticism of Plaintiff's job performance was pretextual, Plaintiff has identified nothing in the record to suggest Commissioner White's other concern–regarding Plaintiff's self-dealing–did not motivate his vote at least in part. *See Jones*, 488 F.3d at 409-10 (holding a disabled employee cannot show pretext through circumstantial evidence that creates an inference of multiple reasons for his termination, where one of those reasons is nondiscriminatory, because the Rehabilitation Act requires disability to be the

a majority of the Election Committee. Thus, any discriminatory intent in the commissioners' criticism of Plaintiff's past performance cannot be the "but for" cause of termination, unless Plaintiff also shows the concern over his self-dealing was likewise pretext. *See Scarbrough*, 470 F.3d at 262.

### d. Timing of the Investigation

Plaintiff's fourth argument attempts to do just that. Plaintiff argues the timing of the investigation into his self-dealing creates an inference of pretext. Plaintiff admits he engaged in self-dealing transactions, but notes those transactions occurred in 2003 and 2004. However, the investigation did not begin until 2006.

The undisputed record suggests several members of the Election Commission were aware of some of Plaintiff's self-dealing from the very beginning. The Election Committee itself approved a motion in September 2003 to allow Plaintiff to form the eGovernment Institute for the purpose of acquiring merchandise for the Election Commission (Court File No. 49, Ex. 1 at 68–69). In addition, Commissioner White, who later voted to terminate Plaintiff in part because of these transactions, was "instrumental" in encouraging Plaintiff to form the eGovernment Institute in the first place (*id.* at 68). In fact, several members of the Election Commission personally purchased merchandise from Plaintiff through the eGovernment Institute (*id.* at 69). Thus, Plaintiff's involvement in the eGoverment Institute appears to have been common knowledge from 2003 onwards.

However, it is also undisputed that the investigation revealed much more than that which the Election Commission had already been aware. The investigation suggested Plaintiff had on multiple occasions double-billed the county for items purchased from the eGovernment Institute. According

---

"sole" reason). Thus, Plaintiff has failed to meet his burden of showing Commissioner White's concern with his self-dealing was mere pretext.

to the investigator, after Plaintiff purchased merchandise through the eGovernment Institute, he would first submit a request for reimbursement in his own name and then later submit an invoice from the eGovernment Institute on the same merchandise, resulting in a double payment (Court File No. 49, Ex. 6 at 17–19). In other words, the investigation suggested Plaintiff had engaged in fraud. There is no evidence in the record suggesting the commissioners were aware of these allegations prior to August 2006.

Moreover, Plaintiff has not identified any evidence suggesting the investigation began at the direction of the Election Commission. Because there is nothing tying the investigation to the commissioners, any suggestion the Election Commission initiated the investigation in an effort to terminate Plaintiff for discriminatory reasons must fail.

According to Commissioner Elliston's uncontradicted testimony, the Election Commission first learned of the extent of Plaintiff's alleged illegal activity from the county mayor's office in August 2006 (Court File No. 49, Ex. 1 at 121–22). In addition, according to the undisputed testimony of Teri Hitchcock, the county mayor's employee who conducted the investigation, the investigation itself was instigated by Fran Green, a member of Plaintiff's staff (Court File No. 49, Ex. 6 at 10). Ms. Green was an assistant administrator of elections under Plaintiff (*id.*). When Plaintiff went on medical leave in 2006, Ms. Green succeeded him as the interim administrator of elections (*id.*). According to Ms. Hitchcock, Ms. Green requested the mayor's office investigate some of Plaintiff's past transactions when Plaintiff was on medical leave (*id.*). When asked why Ms. Green had begun the investigation into Plaintiff's transactions, Ms. Hitchcock testified: "I think it was because there was so many on computer equipment. There were just so many that came through on computer equipment." (*id.* at 11–12). In sum, the undisputed record indicates Ms.

Green–and not any member of the Election Commission–started the investigation into Plaintiff's self-dealing. Thus, even if the timing of the investigation raises an inference of suspicion, there is no evidence which attributes Ms. Green's decision to open the investigation to any member of the Election Commission.[5]

Without evidence of such a causal connection, any suspicion arising from the timing cannot be attributed to Election Commission members. The Sixth Circuit has repeatedly held an independent investigation conducted by the ultimate decisionmaker is enough "to sterilize" an employee's termination from the discriminatory animus of others. *See Clack v. Rock-Tenn Co.*, 304 F. App'x 399, 405 (6th Cir. 2008) (holding supervisor's discriminatory comments and disparate treatment could not be imputed to employer, because the general manager decided to terminate employee based upon an independent investigation) (citing *Wilson v. Stroh Companies, Inc.*, 952 F.2d 942, 946 (6th Cir. 1992)). For example, in *Fuelling v. New Vision Med. Labs.*, 284 F. App'x 247 (6th Cir. 2008), the Sixth Circuit considered the relevance of an immediate supervisor's discriminatory animus when the employer relied upon disciplinary reports drafted by that supervisor in terminating an employee. *Id.* at 258. The Sixth Circuit held the animus was not imputed to the employer, because the employer relied upon more information in making its decision than the contents of those disciplinary reports. *Id.*

In this case, the record indicates without dispute the Election Commission independently reviewed the findings of the mayor's investigation and supplemented it with its own independent investigation. For example, the decision to terminate Plaintiff was made at a public meeting at which Plaintiff was allowed to respond to the accusations contained in the mayor's investigation

---

[5]To the contrary, members of the Election Commission have expressly denied requesting the investigation. (Court File No. 45, Ex. 10 at ¶ 8; Ex. 12 at 7; Ex. 13 at ¶ 4).

(Court File No. 49, Ex. 2 at 33). Thus, because there is no evidence the Election Commission was associated with any animus that may have prompted the mayor's investigation, any such animus is "sterilized" by the Election Commission's independent investigation into the mayor's report. *See Fuelling*, 284 F. App'x at 257–58. In other words, the timing of the investigation cannot be attributed to the Election Commission and thus does not create an inference of pretext.

### e. Newspaper Reports

Lastly, Plaintiff argues newspaper reports of the Election Commission's August 2006 meeting contradict the testimony of Commissioner Elliston and others that Plaintiff was suspended because of the mayor's ongoing investigation (*see* Court File No. 49, Ex. 1 at 117–18). According to these reports' summaries of the proceeding, nothing was stated at the August 2006 public meeting about Plaintiff's self-dealing (Court File No. 50, Ex. 3 at 32–34). Rather the articles only reference the Election Commission's dissatisfaction with Plaintiff's job performance (*id.*).

As a factual matter, these reports do not show any contradiction. The reports also indicate the Election Committee held a non-public, executive session with the committee's attorney, Barrett Painter (*id.*). This account is consistent with the deposition of Commissioner Elliston, who testified it was Mr. Painter's recommendation that the Election Commission formally reinstate and then suspend Plaintiff with pay pending an investigation into his wrongdoing (Court File No. 49, Ex. 1 at 117–18). Since the newspaper accounts indicate Mr. Painter made his recommendation at a nonpublic meeting, it is not a contradiction that the reports would not have included the substance of that recommendation. It is also unsurprising the Election Commission would have kept an investigation of alleged wrongdoing out of public view when that investigation was in its infancy. The newspaper articles themselves indicate Plaintiff requested the discussion about his position be

held at a private, rather than public, meeting (*id.*).  Because there is no contradiction, there is no inference to be drawn in Plaintiff's favor on summary judgment.

### *e. Conclusion*

Having considered each of Plaintiff's arguments, the Court concludes Plaintiff is unable to meet his burden of showing Defendant's reasons for his termination are pretextual.  First, Plaintiff has been unable to show the criticisms of his job performance have no basis in fact.  Indeed, Plaintiff admits he engaged in the self-dealing transactions and the undisputed record indicates Plaintiff had been criticized about his performance for years before he took medical leave.  Second, as discussed above, Plaintiff has not shown any evidence suggesting these reasons were not the real reasons for his termination.  Finally, Plaintiff has not shown any evidence indicating these reasons are insufficient to warrant termination.  In fact, the self-dealing transactions appear to require termination under Tennessee law.  *See* Tenn. Code Ann. § 12-4-102.  Thus, the Court concludes Plaintiff has failed to rebut Defendant's legitimate, nondiscriminatory reasons for his termination. Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim of employment discrimination.

## B.  Retaliation

Plaintiff's second claim alleges Defendant unlawfully retaliated against him after he engaged in activity protected by the Rehabilitation Act and the FMLA.  Retaliation claims under both the Rehabilitation Act and the FMLA employ the *McDonnell Douglas* framework discussed above.  *See McDonnell Douglas*, 411 U.S. at 802; *Gribcheck v. Runyon*, 245 F.3d 547, 549 (6th Cir. 2001) (applying *McDonnell Douglas* to retaliation claims under Rehabilitation Act); *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (applying *McDonnell Douglas* to retaliation claims under

the FMLA). Under either Act, Plaintiff's *prima facie* case is essentially the same, requiring four elements: 1) Plaintiff engaged in a protected activity, 2) Defendant knew about the Plaintiff's exercise of this right; 3) Defendant then took an employment action adverse to Plaintiff, and 4) the protected activity and the adverse employment action are causally connected. *See Gribcheck*, 245 F.3d at 549; *Bryson*, 498 F.3d at 570. If Plaintiff establishes these elements, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802. Once Defendant meets this burden of production, the burden shifts back to Plaintiff to show these reasons are pretexts for discrimination. *Id.*

The Court need not consider whether Plaintiff has met his *prima facie* burden for a retaliation claim, because the analysis of Defendant's legitimate, nondiscriminatory reason, as well as Plaintiff's failure to rebut it, is the same as the above discussion. Therefore, Defendant is entitled to summary judgment on Plaintiff's claims of unlawful retaliation.

### C. Failure to Accommodate

Plaintiff's final claim asserts Defendant violated the Rehabilitation Act by failing to provide a reasonable accommodation of his disability. To prove a failure-to-accommodate claim, a plaintiff must show: 1) he has a disability; 2) he is otherwise qualified for the position; 3) the employer is aware of his disability; 4) an accommodation was necessary, i.e., a causal relationship existed between the disability and the request for accommodation; and 5) the employer failed to provide necessary accommodation. *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004) (citing *Gaines v. Runyon*, 107 F.3d 1171, 1175-76 (6th Cir. 1997)). The plaintiff "bears the initial burden of proposing an accommodation and showing that accommodation is objectively reasonable." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007). The burden then shifts to the

defendant to show the accommodation would be an undue hardship on the employer. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1108 (6th Cir. 2008). Defendant argues Plaintiff has failed to carry his burden of identifying an accommodation which he proposed and which the Election Commission denied. The Court agrees.

Plaintiff identifies two accommodations which he contends were denied by the Election Commission. First, Plaintiff contends Defendant failed to accommodate him when he requested to return from medical leave on June 12, 2006. Plaintiff is correct a request for "a medical leave of absence can constitute a reasonable accommodation under appropriate circumstances." *Walsh v. UPS*, 201 F.3d 718, 726 (6th Cir. 2000). Plaintiff has not identified any case law suggesting the failure to reinstate an employee following medical leave constitutes a failure to accommodate. In the Court's view, such a claim would more appropriately be analyzed as an interference or retaliation claim under the FMLA. *See Harris v. Metro. Gov't of Nashville and Davidson County*, 594 F.3d 476, 482 (6th Cir. 2010). Even if such an act constitutes a failure to accommodate, however, the undisputed record indicates Plaintiff received this accommodation on August 4, 2006, when he was reinstated and suspended pending an investigation into the alleged wrongdoing (Court File No. 49, Ex. 1 at 106–08, 116–19). Because the request was granted, Defendant did not fail to accommodate.

Second, Plaintiff contends the Election Commission failed to accommodate him when it neglected to enter into an interactive process with Plaintiff designed to "identify the precise limitations resulting from the disability and potential accommodations that could overcome those limitations." *See Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 871 (6th Cir. 2008). Plaintiff is correct the failure to enter such a dialogue may constitute a failure to accommodate in and of itself.

*See id.*  In this case, however, Plaintiff did not request such a dialogue until the Election Commission's meeting on August 4, 2006.  Commissioner Elliston's undisputed account of this meeting indicates the Election Commission did discuss Plaintiff's work schedule and other factors with Plaintiff (Court File No. 49, Ex. 1 at 191).  Moreover, even if the Election Commission did not discuss accommodations immediately when requested, such a dialogue would have been premature until the investigation into his alleged wrongdoing was completed.  At the August 6, 2006, meeting, the Election Commission suspended Plaintiff with pay.  Because Plaintiff was not immediately returning to work, it would have been premature to discuss accommodations for his disability.  The Election Commission's decision to suspend Plaintiff was not a denial of his request for an accommodation; it was merely a decision to continue the conversation in the future.

Therefore, because Plaintiff has not identified any reasonable accommodations he requested that the Election Commission denied, Defendant is entitled to summary judgment on this claim.

## IV.  CONCLUSION

For the reasons discussed above, Defendant is entitled to summary judgment on all three of Plaintiff's claims of unlawful disability discrimination.  Accordingly, the Court will **GRANT** Defendant's motion for summary judgment (Court File No. 32) and will **DENY** Plaintiff's counter motion for summary judgment (Court File No. 47).

An Order shall enter.

**/s/**_____

**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**